

# IN THE
# TENTH COURT OF APPEALS

_____

## No. 10-16-00366-CR
## No. 10-16-00367-CR
## No. 10-16-00368-CR

**IRA JAMES BALDWIN,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

_____

**From the 278th District Court**
**Walker County, Texas**
**Trial Court Nos. 27,415, 27,417 and 27,419**

## MEMORANDUM OPINION

Appellant Ira James Baldwin was convicted by a jury of the following:

(1)     Cause Number 27,415:  aggravated assault on Leewaynna Ferguson with a deadly weapon;

(2)     Cause Number 27, 417:  deadly conduct by discharging a firearm at or in the direction of Danielle Archie; and

(3)     Cause Number 27,419:  deadly conduct by discharging a firearm at or in the direction of Marquita McGuire.

Baldwin elected to have the trial court impose punishment, and he was sentenced to twenty years' incarceration on each charge, all to be served concurrently. In his sole issue on appeal, Baldwin asserts that the trial court erred in precluding him from arguing in closing that the jury could infer a co-perpetrator's guilt from his flight. We will affirm.

*Background*

The majority of the underlying facts are not in dispute. On the evening of July 12th, 2015, Leewaynna Ferguson was shot multiple times while a back-seat passenger in a car driven by Danielle Archie. Marquita McGuire was in the front passenger seat. All three women reported to the police and testified at trial that Baldwin and Nicholas Allen were responsible for the shooting. Baldwin was indicted for aggravated assault and deadly conduct, and Allen was indicted for being a convicted felon in possession of a firearm. After Allen was released on bond, no one admitted having contact with him between April 2016 and August 2, 2016, when Baldwin's trial began.

Leewaynna, Marquita, and Danielle testified specifically about the events surrounding the shooting. On the evening of July 12th, they were driving around and ran into Baldwin at Dupre's, a popular local rapper's house. Baldwin yelled at both Marquita and Leewaynna. Baldwin told Leewaynna that he was "going to fire you up" or put fire to her, meaning that he was going to shoot her. Danielle then drove off. The women drove around for awhile and ran into Baldwin again close to Oakwood Cemetery. Allen was getting out of a minivan or SUV that was similar to one driven by Baldwin's sister, and Baldwin was standing a little ways off under a street light. Both began walking towards Danielle's car, and Allen handed Baldwin a gun. Baldwin crossed in front of the

car and walked around to the driver's side. As it was evening, the car's headlights were on. Baldwin then looked at Leewaynna, raised the gun, and said, "Bitch, you're going to die." Baldwin then began shooting. Leewaynna was hit in her right leg and tried to climb into the front of the car to escape the bullets. Marquita got down in the front passenger seat, and both she and Leewaynna were screaming for Danielle to go. Baldwin continued to shoot at the car as they drove away. All three women testified that the man who shot Leewaynna and continued to shoot at the car was Baldwin. All three women had known Baldwin for years, and Baldwin was the father of two of Marquita's children. All three women testified that they were positive that the shooter was Baldwin. Baldwin was also seen immediately prior to the shooting with a gun in his hand by one of his relatives—Donna Merchant.

Dacorian Jackson was walking in the area when the shooting occurred. He testified that he saw two African American males exiting an SUV and heading for a car stopped at a stop sign. As Jackson went behind the SUV, he heard one of the men chamber a round in a gun and cock it, and he then heard shots being fired into the car. Jackson testified that he was unable to tell which of the men actually cocked the gun. After the shooting started, Jackson ran from the scene and didn't look back.

Police recovered seventeen shell casings at the scene of the shooting, and documented thirteen or fourteen bullet holes in Danielle's car. The bullet holes were concentrated on the driver's side rear door and the rear of the car. Both the driver's and the rear driver's side windows were shattered. No fingerprint or DNA analysis was conducted on the shell casings.

Prior to trial, Marquita reconciled with Baldwin and attempted to recant her previous statements, telling the prosecutors that she did not see Baldwin shoot into the car nor did she see Allen hand Baldwin a gun. After being confronted with the recorded statement she provided immediately after the shooting, she withdrew her recantation and testified at trial consistent with her recorded statement—that she saw Allen hand Baldwin a gun that Baldwin used to shoot into the car.

Leewaynna testified that she had a disagreement with Baldwin a day or so prior to the shooting because of some postings she made on Facebook reporting that Baldwin and Allen robbed her son's father. There were numerous unpleasant telephone and Facebook exchanges between Leewayna and Baldwin, including a posting in which Leewaynna questioned Baldwin's masculinity. Leewaynna testified that she thought Baldwin's Facebook's comments meant that he might fight or hit her when he saw her, not that he was going to shoot her. Baldwin's Facebook page was deleted between the time of the shooting and the police investigation.

Danielle testified that Leewaynna also had words with Allen prior to the shooting, but that neither Danielle nor Marquita had a problem with Allen. Danielle further testified that the problem Leewaynna had with Allen was the same Leewaynna testified she had with Baldwin—that she was "running her mouth" about Allen and Baldwin supposedly robbing someone.

### *Issues*

Baldwin presents three arguments in support of his issue: (1) he should have been allowed to present the alternative perpetrator defense because it was supported by the

evidence; (2) as he was entitled to present an alternative perpetrator defense, the trial court abused its discretion in not allowing him to argue that Allen's flight was indicative of Allen's guilt; and (3) the trial court's denial of his flight argument violated his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and under Article 1, Sections 10 and 19 of the Texas Constitution.

Although Baldwin splits his argument into three separate grounds, the actual issue is whether the trial court erred in precluding him from arguing to the jury that they should infer that Allen's "flight" was evidence of his guilt for the shooting, thereby proving Baldwin not guilty. Assuming without deciding that the record supports an alternative perpetrator defense, we conclude that the trial court did not abuse its discretion in limiting Baldwin's closing argument.

### *Analysis*

A trial court's limitation of a defendant's closing argument is reviewed for an abuse of discretion. *See Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010). The trial court has broad discretion in controlling the scope of closing argument, but it may not prevent defense counsel from making a point essential to the defense. *Wilson v. State*, 473 S.W.3d 889, 902 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). A defendant has the right to argue any theory supported by the evidence and may make all inferences from the evidence that are legal, fair, and legitimate. *Id.*; *see also Melendez v. State*, 4 S.W.3d 437, 442 (Tex. App.—Houston [1st Dist.] 1999, no pet.), *overruled on other grounds by Small v. State*, 23 S.W.3d 549 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). Prohibiting

counsel from making a particular jury argument when counsel is entitled to do so is a denial of a defendant's right to counsel. *Wilson*, 473 S.W.3d at 902.

Evidence of flight, while not dispositive, may be considered by the fact finder as an inference of a defendant's consciousness of guilt. *Alba v. State*, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995) (citing *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989)); *see also Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994), *overruled in part on other grounds by Tennard v. Dretke*, 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 3284 (2004); *Suarez v. State*, 31 S.W.3d 323, 327 (Tex. App.—San Antonio 2000, no pet.). This inference is usually presented by the state against a defendant. Baldwin points to no authority, nor have we found any, that extends the same inference to a witness, or a co-perpetrator, who is absent from a defendant's trial. Even assuming that such an inference is applicable in this case, Baldwin's claim of error is not supported by the record.

When the state attempts to use a defendant's flight as an inference of guilt, "the circumstances must indicate that the flight is 'so connected with the offense on trial as to render it relevant as a circumstance bearing upon his guilt." *Fentis v. State*, 582 S.W.2d 779, 781 (Tex. Crim. App. 1976) (quoting *Hicks v. State*, 82 Tex. Crim. 254, 256, 199 S.W. 487, 488 (1917)); *see also Lee v. State*, 176 S.W.3d 452, 462 (Tex. App.—Houston [1st Dist.] 2004, *aff'd* 206 S.W.3d 620 (Tex. Crim. App. 2006). The trial court permitted Baldwin to present the testimony of Allen's bail bondsman, John Arthur Lagway, Jr., who testified that Allen had failed to remain in contact with him as required by his bond agreement. Lagway additionally testified that, in his opinion, Allen was "on the run." Even if Allen fled from his bail bondsman, there is nothing in the record to indicate that he fled to avoid

arrest or prosecution for the charges against him arising out of this case. Lagway testified that Allen had missed no court appearances, that he had not violated any court orders, and that there were no warrants issued for his arrest. Although Lagway applied to have Allen's bond revoked, he did not do so until after Baldwin's trial began. There is nothing to indicate that Allen fled to avoid arrest or prosecution in this case. The trial court did not err, therefore, in sustaining the State's objection to Baldwin's possible closing argument regarding Allen's flight.

Even if there was some evidence linking Allen's "flight" to the trial in this case, Baldwin was able to get that information and the possible inference of guilt before the jury. Defense counsel first mentioned Allen during opening statements and continued to focus on him through the remainder of the trial. Defense counsel successfully emphasized the evidence against Allen through cross-examination of various witnesses. Defense counsel's cross-examination of Danielle established a potential motive for Allen to have shot Leewaynna because Leewaynna was broadcasting Allen's alleged participation in a robbery, casting doubt on Leewaynna's testimony to the contrary. Danielle also testified that Marquita knew about the dispute between Leewaynna and Allen, casting doubt on Marquita's previous testimony that she knew of no relationship between the two. Defense counsel further elicited from Danielle that she had a falling out with Marquita and Leewaynna because they re-established relationships with Baldwin after the shooting.

Defense counsel's cross-examination of Jackson established that the street where the shooting occurred was poorly lit and that the two men Jackson saw were not close

together, casting doubt on the women's testimony that they saw Allen hand Baldwin a gun. Defense counsel also elicited from Jackson the testimony that he saw one of the men get out of an SUV, immediately precede to the stopped car, and begin shooting, also casting doubt on the testimony of the gun exchange. Defense counsel further brought out on cross-examination the various versions of events Marquita gave to the police and the prosecutors, emphasizing that she told the prosecutors prior to trial that she never saw Allen hand a gun to Baldwin and never saw Baldwin shoot a gun. Finally, in closing argument, defense counsel emphasized the evidence indicating that Allen was the shooter.

Additionally, as previously noted, defense counsel inserted the issue of Allen's possible guilt for the shooting throughout the course of the trial. Although the trial court sustained the State's objection to defense counsel arguing in closing that Allen's "flight" was an inference of guilt, defense counsel raised Allen's absence during his closing argument anyway, noting:

> I want to start with the name of a young man - - they're going to get up and say, you know what, all Paxton's doing is trying to point the finger at him and putting Nicholas Allen on trial, and that's exactly right. I'm not going to beat around the bush. I told you that in opening statement. They didn't even mention his name in opening statement; did they, and then I called his bondman - - and you take it for what it's worth. John Lagway is a nice man, and he said that he hasn't heard from Nicholas Allen since April, and they can tell you well, you just did this the other day, and this is just about money, and you heard Lagway's opinion, who's been doing this since '92, and what does he tell you? He just looks you right in the eye, he's on the run. Do with that what you want, but those are the facts. They didn't tell you his name in opening statement, because the kid's on the run.

Defense counsel's closing argument implicitly put the inference of Allen's guilt due to his flight before the jury. The only thing defense counsel did not do was specifically state, "Jurors, you may infer Allen is guilty of shooting Leeshanda and shooting at Danielle and Marquita because he has fled, and you must, therefore, find Baldwin not guilty." The trial court did not err in limiting Baldwin's closing argument, and, if the trial court did err, it was harmless error as the inference of Allen's guilt due to his "flight" was effectively presented to the jury.

We conclude that the trial court did not abuse its discretion in limiting Baldwin's closing argument. Accordingly, we overrule Baldwin's sole issue and affirm the trial court's judgment.

REX D. DAVIS
Justice

Before Chief Justice Gray,*
 Justice Davis, and
 Justice Scoggins
*(Chief Justice Gray concurs in the Court's judgment to the extent it affirms the trial court's judgment. A separate opinion will not issue. He notes, however, that he does not join the error analysis finding of no error, but only the harmless error.)
Affirmed
Opinion delivered and filed October 24, 2018
Do not publish
[CR25]

